MEMORANDUM OF DECISION
These consolidated termination of parental rights was filed by the Department of Children and Families ("DCF") seeking to terminate the parental rights of the biological mother and fathers f Nelson T., Angel T., Jessica D., Daniela R., Jose M. and Crystal M.
The mother of all of these children is Migdalia M. The Department alleges that the children have previously been adjudicated neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the each of the children, the mother could assume a responsible position in the life of each of the children. General Statutes
section 17a-112 (c)(3)(B).
The father of Nelson T. and Angel T. is Luis T. The father of Jessica D. is Jose D. The father of Daniela R. is Juan R. The father of Jose M. and Crystal M. is Jose M. In each instance, that is as each of the four fathers, the Department alleges that, as to the irrespective children, the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. General Statutes section 17a-112
(c)(3)(A). The Department as an additional ground seeking the CT Page 3221 termination of the parental rights of Daniela's biological father and Jose M. and Crystal M.'s biological father, alleges that the child having previously been adjudicated neglected, the biological father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, the biological father could assume a responsible position in the life of each of the children. General Statutes section 17a-112
(c)(3)(B).
The petitions for termination of these parents' parental rights in these six children were filed on October 24, 1997. That therefore, is the adjudication date. Trial commenced on this matter on December 9, 1998. It continued on December 10, 1998. Because of difficulties with witness scheduling, the final day of trial was February 26, 1999.
 ADJUDICATION
The Fathers
As to each of the biological fathers, the Department has sought a termination of parental rights based upon an allegation of abandonment. Abandonment focuses on the parent's conduct. In re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992); In re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987); In re Kezia M., 33 Conn. App. 12, 632 A.2d 1122 (1993).
1. Luis T.
Luis T. was served with notice of these proceedings by publication. DCF also attempted to find him by inquiries and notices to his last known address, telephone number, and inquiry through Department of Motor Vehicles, Department of Corrections and the Town Hall of his last known address. He was never found. The court finds service proper and that reasonable efforts were undertaken to give him timely notice. A default is entered as to Luis T.
The evidence reveals the following facts regarding Luis T. He has never been a part of the lives of Nelson T. and Angel T. He has shown no interest in them. He has maintained no contact of any kind or nature with them. He has provided no support for them. CT Page 3222
"Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal(Docket No. 9489). 183 Conn. 11, 14, 438 A.2d 801 (1981). The only contact Luis T. has had with his sons Nelson T. and Angel T. was early in their lives. When they were born (November 26, 1987 and March 4, 1989 respectively) Luis T. lived in the house with Nelson T. and Angel T and their mother Migdalia M. Shortly after Angel's birth in 1989, Migdalia moved away with the two boys. After he pursued her and he was arrested for doing so, he left Connecticut. Since late 1989 or early 1990, Nelson T. and Angel T. have had no contact with their father. This period of abandonment continued for approximately seven years at the time of the filing of the petition for termination of parental rights, and continues through to the disposition date.
The court finds that DCF has proven by clear and convincing evidence that Luis T. has abandoned Nelson T. and Angel T.
2. Jose D.
Jose D. was served by publication in a newspaper with general circulation in the New London — Groton area. DCF attempted to contact him at his last known address unsuccessfully. The court finds that service was proper and DCF's efforts to locate Jose D. were sufficient. No further efforts are required. A default enters as to Jose D.
The father of Jessica D. is Jose D. He lived with Migdalia D. at the time of Jessica's birth on November 18, 1990. During this time Migdalia's younger sister Karen stayed weekends at their home. Karen was a minor. Migdalia suspected Jose D. was having sexual relations with this minor Karen. While he denied it, based on Karen's statements, Jose D. was arrested and charged with Risk of Injury to A Minor and Sexual Assault. These circumstances provoked Migdalia to move with all three children to Hartford.
Since then Jose D. had shown no interest in Jessica D. He has not seen her or communicated with her at all. He has not provided her any support. He has made no attempt to maintain or establish a relationship with Jessica D. After Jessica D. was initially removed from Migdalia's home (discussed infra), Jose D. sought custody of Jessica. A record check revealed that he has a police record for the Risk of Injury to A Minor and Sexual Assault CT Page 3223 charges. He had no relationship with Jessica to that point. DCF recommended he establish a relationship through visitation with Jessica. In response to a letter from DCF he made a phone call to set up an appointment. He never appeared for the appointment and has shown no interest in Jessica since The court finds that DCF has proven by clear and convincing evidence that Jose D. has abandoned Jessica D in that he has failed to maintain a reasonable degree of interest, concern or responsibility in or for Jessica D.
3. Juan R.
Juan R. is the father of Daniela R. He was served in these proceedings by publication in a newspaper with general circulation in Hartford. DCF who made the following efforts to locate him: Department of Motor Vehicles, Department of Corrections inquiry, mail to his last known address, and inquiry unsuccessfully attempted through his sister. The court finds service was proper and attempts at notice was adequate. A default enters as to Juan R.
Initially he expressed interest in his relationship with Daniela. Court expectations were provided to Juan R. on November 8, 1996. He agreed to cooperate with these expectations. They were: (1) Keep all appointments set with DCF and keep your whereabouts known to DCF or your attorney; (2) Visit Daniela whenever DCF permits; (3) Participate in the following forms of counseling: parenting, individual and drug/alcohol counseling; (4) Attend AA and NA at least weekly; (5) Sign release when requested; (6) Abuse no substances; and (7) Have no further involvement with the criminal justice system.
Juan R. was unable or unwilling to comply with these expectations. He did not keep all his appointments with DCF. His whereabouts are unknown. He did not inform his attorney or DCF of his address. He last visited with Daniela sometime shortly before April 25, 1997. On that date, he failed to attend a visit with Daniela and he has been missing since. He never attended parenting counseling. He refused to cooperate with a drug and alcohol evaluation nor would he provide a urinalysis. No information was provided by him to DCF as to whether he ever attended NA or AA or individual counseling. To March, 1997, he had been arrested in excess of 26 times. He had a conviction record for drug charges, assault charges, and escape in the second degree. He has provided no financial support for Daniela. CT Page 3224 He not only has failed to unite since April 1997, he has failed to attempt any contact with Daniela. "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Luke G.,40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985); In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 532 (1986).
The court finds that DCF has proven by clear and convincing evidence that Juan R. has abandoned Daniela R. He has failed to maintain a reasonable degree of interest, concern or responsibility in or for Daniela. the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. The court further finds by clear and convincing evidence that the child Daniela R. having previously been adjudicated neglected, the biological father Juan R. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a I reasonable time considering the age and needs of the child, the biological father could assume a responsible position in the life of Daniela R.
4. Jose M.
Jose M. was served by sheriff through certified mail in Florida. Service was confirmed by certified mail return receipt.
Jose M. is the father of Jose M. (also called Joselito) and Crystal M. Jose M. and Migdalia M. married on January 15, 1994. This was after Joselito's birth on December 19, 1993, and, prior to Crystal's birth on February 2, 1995.
Jose M. was physically abusive of Migdalia M. As a result of his abuse toward her Jose M. was incarcerated in Connecticut from May 3, 1997 to August 4, 1997. These parents have not lived together since March of 1996.
During the period of his incarceration he visited monthly with his two children. The children were transported to visit him at the prison by DCF. Upon his release from prison he initiated no contact to visit with the children.
Mr. M. has had problems with drug abuse. During the period preceding his incarceration, in 1996, he tested positive for cocaine. Jose M. has a criminal record for conviction of offenses CT Page 3225 including two counts of violation of protective order, two counts of assault 3rd, violation of probation (three counts), and several larcenies.
A service agreement with Mr. M. during the neglect proceedings required him to participate in and successfully complete anger management classes. He failed to do so.
In October, 1997, DCF contacted Mr. M. to inquire of his intentions regarding his relationship with Joselito and Crystal. On October 11, 1997, he told DCF he was moving to Florida. At that time he was verbally informed of the impending termination of parental rights petition. He moved to Florida and was properly served by DCF there. He has made no effort to be a part of the lives of Joselito and Crystal since August 1997. He has not supported them. He has not initiated contact with them. He has not demonstrated concern for their case or welfare, even when informed of these termination proceedings. He has failed to visit with them.
The court finds that DCF has proven by clear and convincing evidence that Jose M. has abandoned his two children, Jose(lito) M. and Crystal M. DCF has proven by clear and convincing evidence that Jose M. has failed to maintain a reasonable degree of interest, concern or responsibility as regards to Jose(lito) M. and Crystal M. The court further finds by clear and convincing evidence that the children Jose M. and Crystal M. having previously been adjudicated neglected, the biological father Jose M. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of each of the children, the biological father could assume a responsible position in the life of either Jose M. or Crystal M.
Mother: Migdalia M.
Migdalia M. is The mother of all six children; Nelson T., Angel T., Jessica D. Daniela R., Jose M. and Crystal M. Until the children were physically removed from her care by DCF, all of he children had lived continuously with her since birth. Migdalia M. was born September 2, 1971. Presently she is 27 years old.
Her first two children, Nelson T. and Angel T. were born as a result of a relationship with Luis T. forced on her by her mother. When Migdalia was thirteen (13) years old her mother CT Page 3226 introduced her to Luis T. who was, at that time in his mid 30's. Despite her strong and sustained resistance to her mother, Migdalia M. was forced her into the relationship with Luis T. through the use of physical abuse and threats. She was very upset but also very fearful of her mother. After the birth of Nelson T. she attempted to go back to high school. However, she was prevented from doing so by her mother after Luis T. asserted she was socializing with teenage boys around her own age. Mr. Luis T. had other children who he brought to the home for her to care for. He was physically abusive of her and of his two sons. After Luis T. broke the jaw of one of his two sons and was arrested, Migdalia sought to leave.
Migdalia M. took refuge from this tragic and oppressive life when she moved with Nelson T. and Angel T. to the home of a step-brother in a different community. She voluntarily contacted DCF to help her keep Luis T. away from her and the children. She then went to live on her own that she met Jose D. The problems with their relationship have been detailed supra. Migdalia, now with three children four years of age and under, was once again faced with a necessary move. She moved to another community. She was alienated from her own family because they blamed her for Jose D's sexual assault on her sister.
Quickly, again, she became involved in another relationship, this time with Juan R. By now Migdalia was twenty years old and the mother of three young children. Juan R. had constant contact with the criminal justice system. He was incarcerated at recurring intervals from April 27, 1988 to July 22, 1996. He had a drug problem and would steal from Migdalia M. It progressed such that he ultimately stole everything she had. She moved out and subsequently discovered she was pregnant with Daniella. Upon moving out, she went back to live in the same community she had lived in when Jessica was born. This is where she became involved with Jose M.
Migdalia M. had known Jose M. from childhood. They were both from New York City. They married (although she subsequently discovered he had an already existing marriage). As related earlier in this opinion, their marriage was punctuated by Jose M.'s violence toward Migdalia M. The children, Joselito M. and Crystal M. were born. When Crystal was born, Migdalia was 23 years old. She had six children. The oldest four children had no relationship with their fathers. Joselito and Crystal only lived with their father to March, 1996. Since then, Migdalia ha been CT Page 3227 the sole caretaker of all four children.
DCF had received numerous referrals regarding these children since 1989. While court proceedings were not commenced until 1996, DCF had investigated referrals claiming the mother's neglect and the children being at risk in October, 1989, March, 1991, February, 1993, Mary, 1993 and March, 1994.
In 1994, Nelson T. was seven years old. His school teacher contacted DCF because he reported he was left alone to babysit for his 5 siblings. As of that call date, school personnel reported he was frequently very tardy and frequently came to school dirty.
Four months later the school reported his tardiness had continued.
On May 7, 1995, DCF received another referral from a neighbor. The referral related that there was no parental supervision, the children played alone in the road and one climbed on her roof.
A similar referral came in February 1996 that the children were without supervision, left home alone, that Jose M. could be heard assaulting the mother, and there appeared to be drug activity. There was police verification at the time of the call that three young children were home alone.
One month later, Angel T. then seven years old was arrested for starting a fire with a lighter. That same month another anonymous call claimed the six children were beaten by both of their parents, and the children were not fed regularly. Against this history of referrals July, 1996, DCF's involvement increased with this family. On July 27, 1996, DCF received another anonymous call regarding these six young children. The caller's concerns were detailed to DCF. DCF investigated the claims that day. Migdalia's home was visited by two DCF social workers. The workers interviewed Migdalia's mother and visited the children's home. The maternal grandmother stated the children were not fed regularly at home so she often fed them. She also reported the children were not supervised or left with an inattentive neighbor.
Upon visiting the home the DCF workers observed the following conditions. CT Page 3228
1. The third floor apartment had open windows with no adequate screens, including in the children's sleeping rooms.
2. The children were eating scraps of food off of the floor.
3. When admonished to feed them, Migdalia put out one bowl with dry cereal out for all six children to share.
4. The five year old, Jessica, stated that all of the children play outside (unsupervised) by themselves.
On that day, DCF issued a 96 hour hold on all six children. At time of picking up the children, Daniela had no shoes, and no medicine for the children was provided by the mother. Physical examination of the children after removal revealed the following circumstances. Nelson T. (then eight years old) had yellow pus draining from his ear; he had a perforated eardrum. Angel T. (then seven years old) had healing abrasions on his left knee and the left side of his back. Jessica D. (then five years old) who had been provided medical care for seizures in 1993, had had no follow up evaluation at Newington Children's Hospital, although appointments had been set up for the mother to do so. Jose M. (then two years old) under his left eve had a triangular shaped scab and a red mark the size of a nickel on his left chest. Crystal (then 1 1/2 years old) had missed many of her immunization shots.
An Order of Temporary Custody was issued on August 9, 1996.
On November 8, 1996, all six children were adjudicated neglected and were committed to the care of DCF for a period not to exceed 12 months. That commitment was extended on September 17, 1997.
The children were all adjudicated neglected on November 8, 1996 and committed to the custody of the Commissioner of DCF. Expectations were ordered and issued by the court to Migdalia M. on November 8, 1996. She was informed that if she complied with the expectations it would increase the likelihood that her children would be returned to her. She was informed that her failure to comply with the expectations increased the likelihood that DCF would seek to terminate her parental rights in her six children. CT Page 3229
The court ordered expectations were:
1. Keep appointments with DCF and cooperate with DCF and other service providers.
2. Make your whereabouts known to DCF or your attorney.
3. Visit your children as frequently as DCF will allow.
4. Participate in individual therapy. Individual therapy should address issues of domestic violence, sexual abuse, emotional abuse, and physical abuse.
5. Participate in and complete budget classes, meal planning and preparation nutritional needs of young children classes.
6. Sign releases when requested.
7. Participate in parenting counseling.
8. Participate in family counseling.
9. Participate in drug/alcohol counseling.
10. Secure/maintain adequate housing and (income) employment.
11. No substance abuse; no use of non-prescribed drugs.
12. No further involvement with criminal justice system.
Also, Migdalia M. entered into a service agreement with DCF for the periods from December 3, 1996 through June 21, 1997. A second service agreement was placed in evidence, but it appears to cover a portion of the time period of the first agreement.
Migdalia M. kept most of her appointments with DCF: from the period of November 8, 1996 to October 24, 1997, she missed four appointments. For a short while when moving, her whereabouts were unknown to DCF.
Migdalia M. missed many visits set up for her children to see her. As a result, the visits were curtailed to one time a month. Recently, during the termination proceedings, the visitation was increased to weekly. In July, 1997, a visitation that was set up with Migdalia and only the girls was skipped entirely by her. CT Page 3230
Migdalia M. did attend parenting classes and complete them in April 16, 1997.
She tested positive for cocaine on a hair test in January, 1997. Migdalia M. has steadfastly denied she had used or uses any drugs. She initially went for drug counseling in compliance with the court ordered expectations but then refused to quit. After a DCF social worker told Migdalia that she was transferring the case to the department of DCF that pursues termination of parental rights cases, she asked for a new drug counseling referral. She contacted "New Perceptions" in July, 1997 and completed the evaluation November 18, 1997. She continued to deny a drug problem. On discharge she was recommended to pursue individual counseling for personal issues.
Individual counseling was part of the November 8, 1996 count ordered expectations. Migdalia M. commenced individual counseling recently at United Services. She started individual counseling on April 16, 1998. This 1 and 1/2 years after the expectations requiring individual counseling were issued. She missed 5 therapy appointments, failing to show up for 4 of them. However, in that counseling, only present issues, particularly symptoms of depression have been pursued. She has refused to discuss issues of her past involving the sexual abuse with her counselor although he raised it with her several times She has had no individual counseling on the issues of domestic abuse, sexual abuse, emotional abuse and physical abuse. Migdalia has, by her own accounts, as related herein and in the DCF narrative, been victim to all of these facets of human abuse. Her lack of pursuit of counseling in each of these areas has resulted in her inability to develop, grow, mature and ultimately, I rehabilitate herself.
Migdalia did complete parenting classes, having received a referral for the same in February, 1997. She satisfactorily completed the program. She was punctual, participated, and took all necessary testing.
No evidence was elicited in regard to the signing of releases. Therefore, the court conclusively presumes that there has been satisfactory compliance.
Ms. M. moved four times in a year. She currently lives with a boyfriend. He was recently arrested for possession of cocaine. CT Page 3231 She denies he has any drug involvement.
Ms. M. was herself arrested in August, 1998. She was charged with breach of peace from an incident between her and her present boyfriend's former girlfriend. She pled guilty and paid a fine. In October, 1997 she was arrested on two bad check charges. Both were nolled in March, 1997.
Ms. M. worked for a period of time as a machine operator. It is not clear how long she kept this job. In December, 1997, it was reported she had it for six months. By August, 1998, she was no longer working. She was living with her boyfriend and relying on him for her support. The updated DCF study in evidence reveals that Migdalia had changed her live-in boyfriend two times in three months. Not only does the present boyfriend have pending drug charges but the immediate previous boyfriend also has a criminal history.
The mother's compliance with the expectation orders, then, can best be characterized as partial at best. What is of the most concern are the significant, substantive areas of noncompliance.
Migdalia's rehabilitation is dependent on her ability to mature so that she is aware of the needs of her children and so that she can provide for their needs: shelter, food, safety and medical care, their emotional and nurturance needs, consistent discipline and support. Her ability to pick partners who are safe for the children, is essential to their safety, so they may live in a drug and violence free home.
The mother's failure to engage in individual counseling on these difficult areas so essential her growth has stymied her ability to rehabilitate. Her partner selection remains poor. She continues to have involvement in the criminal justice system. She has also failed to follow through on budgeting, nutritional or meal planning classes. She has failed to be consistent in her visits with the children.
The quality of her parenting has not improved as a result of her parenting classes. Ms. M.'s visits are supervised with the children. When Ms. M. is with the children she is unable to set limits for them. She allows inappropriate, rough and raucous play. She does not parent or support the children. She sits down as if she were another child and plays, demonstrating her play products rather than supporting the children in them. She is CT Page 3232 overwhelmed by conflict between the children, quickly giving up after a brief attempt to talk to them. When with the children she would not greet all of them. She would focus on one and ignore the others even when they demonstrated distress. These inadequacies in her parenting skills never were ameliorated from the time of November, 1996 to the filing of the Petition for Termination of Parental Rights to the present time.
Two different psychological evaluations were performed regarding this family. An initial evaluation was performed by Nancy Randall, a Connecticut licensed psychologist. When issues were raised whether the evaluation (and associated testing) should have been conducted in Spanish (Migdalia M.'s first language) a second evaluation was ordered and completed by Dr. Rafael Mora De Jesus, a Connecticut licensed psychologist. This latter evaluation including testing, was conducted in Spanish. In these evaluations, both doctors were asked to formulate recommendations for planning for the children, most consistent with the children's best interests.
Dr. Randall found the mother to believe hat she has been treated unfairly and has adequately taken care of her children and provided them appropriate supervision. She did not think there was any reason the children should have been removed from her care. During the parent/child evaluation she was unable or unwilling to divide her attention among the children. She made no attempt to intervene when older children were rough with Crystal. She made some attempts to organize the children's play but would give up easily. Nelson was viewed to take on a parental role with the younger children and his mother. Dr. Randall observed the mother to be unable to supervise the children and in need of long term therapy to acquire better coping skills and to understand how her poor parenting in the past effected the children. Dr. Randall determined that therapy would be difficult for Migdalia M. because she would not accept the questioning and possible criticism. Given the age of the children, the amount of time they have been in foster care and the mother's need, not only to be willing to face her issues, but also to engage in long term therapy, Dr. Randall recommended in her evaluation that all of the children be freed for permanent placement.
In her interview with Dr. Randall, Ms. M. related facts regarding the children's removal in July 1996 that reflected no sense of personal responsibility for the state of the care of her children. She does not explain Nelson's perforated eardrum. She CT Page 3233 denies the doctor referred her to Newington Children's Hospital for an evaluation of Jessica. She denies that Crystal missed appointments for immunization shots. She blames the children's lack of supervision on a neighbor. She denied the I children had inadequate screens on their windows. She denied Nelson ever babysat the younger children. She stated he missed a lot at school because she could not get him to sleep. Finally, she indicates she has only moved twice in the last year. While Ms. M. continues to deny drug involvement herself or her partners, she continues to select partners who have drug involvement.
Dr. Randall also observed Ms. M. with the children. She failed to set limits for the children. They were loud, disruptive, and engaged in rough play. She was easily defeated and quit quickly in attempts to organize them. She failed to protect the youngest from the older children's rough play. Notwithstanding all of this, Ms. M. denies any difficulties or problems in parenting her children.
In discussing her past history, Ms. M. minimized its impact on her or the children to Dr. Randall. She denies that she will need any parent support services if the children were to come home to her. She indicates she has family support. She blames DCF for the present predicament of her children's removal.
Dr. Mora de Jesus' evaluation of Ms. M. is revealing. She is a defensive woman with poor self-esteem. In testing, the doctor determined that she has perception inaccuracies. While she makes effort to solve problems, she suffers from a chronic sense of emotional overload. She is overwhelmed by her every day life, her interpersonal relationships and dealing with DCF. In this sense of being overloaded she is disorganized and has difficulty coping with her immediate situations. This makes her passive in her dealing with the children.
Nelson was born on November 26, 1987. He is presently 11 years old. He has a congenital heart condition which required cardiac surgery when he was 2 years old. He has been hospitalized while in his mother's care for lead poisoning, at age 3. He had eaten chips of paint in his home. He has been diagnosed as a special needs child as a result of his lead poisoning. He is in special education classes; he receives SSI.
Nelson has attended counseling to deal with issues of separation, abandonment and parentification. CT Page 3234
When Nelson lived with his mother, she would leave him at home alone to care for his younger siblings. This is an entirely inappropriate role for one so young. In meeting with Dr. Mora de Jesus, Nelson feels he is to blame for his family's breakup; that it occurred because he was unable to adequately care for his brothers and sisters.
Nelson's parentification was observed by Dr. Randall as well. He was observed even trying to take care of his mother, not just his siblings. Former DCF worker Ms. Halpine noted that of all the children Nelson and Angel (the oldest) seem to have some bond with the mother. She saw no strong bond between the other children and their mother. Nelson was very loving, in her observations, to his other siblings. At times, he would become very angry with his mother and not want to interact with her. This was true of Angel as well. Angel, at visitations, appear very happy to see his siblings.
Angel was born April 4, 1989. He is presently 9 years old. At the time of the filing of the petition he was attending third grade. He is in good health with no significant health history. He lives in the same foster home at Shirley Smith's with Nelson. Angel is a youngster who is easily frustrated and sometimes impulsive when angry, according to Dr. Moro de Jesus. He is sometimes infantile and needy of attention but has difficulty committing to relationships. It is recommended that he have counseling to deal with issues of fear of abandonment.
Presently, Nelson T. and Angel T. live in a foster home with their foster mother. Nelson and Angel have been with her since July 28, 1997. She and the children appear to be bonded to each other in that she loves the boys and believes they love her. Foster mother was widowed in 1994 and is remarried. She has grown children. Foster mother testified at the hearing, if permitted to do so, she would like to adopt Nelson and Angel.
Nelson attends public school in the 5th grade. He is in a special education program. Nelson and Angel attend church every Sunday and sing in the church choir. The foster mother believes that the boys' involvement in church has helped them quite a bit. Nelson has received many certificates of recognition for his efforts at school. He is a motivated young artist. He and Angel refers to foster mother as Nana. When they came to her home they fought a lot but do not fight much any more. Angel is very CT Page 3235 involved with judo and cub scouts. He has also received a certificate award for outstanding achievement at camp. He has been a program leader.
Jessica D. was born on November 18, 1990, she is presently 8 years old. At the time of the filing of the petition she was attending second grade and doing well in school. Her health is presently good. She was treated for seizures as a baby. She was behind in her immunization shots at the time she was taken into custody; these have been brought current. Dr. de Jesus reports that she suffers from significant fear of loss and abandonment: "She appears to have anxiety due to lack of security and continuity in terms of her placement and this appears to be one of her major areas of anxiety. She has difficulties with her emotional expression and the management of her anger."
Daniella R. was born September 7, 1992. She presently is 6 years old. She is delayed in her speech development. At the time she was taken into custody her immunization shots were behind; these have been brought current. At the time of the filing of the petition she was attending Kindergarten. She was found by Dr. de Jesus to be withdrawn and depressed as a result of feeling that she has very little control over her environment. She has significant feelings of guilt, anger, worthlessness and self-deprecation.
In visits with her biological mother, Daniella visits well with her sisters but does not ineract much with her mother or brothers. Her mother does not seek to include her in visits.
Crystal M. was born on February 2, 1995. She presently is 4 years old. She developed asthma as and infant. Her immunization shots were behind when taken into custody; they are now current. Dr. de Jesus found that she appears to be very regressive and infantile and that she is in need of frequent attention and reassurance. She is described as an insecure child who acts out for attention.
Jessica and Daniella have been in treatment with a social worker, Ms. Soto. She reports that she has treated Jessica together with Daniella. She treated them starting in 1996 for a period of 18 months. Jessica reported that her cousins and brothers had touched her in her private parts. In her therapy, neither Jessica nor Daniella would bring up their biological mother. When she was summoned as a topic of discussion by the CT Page 3236 therapist, neither girl expressed anything beyond the reportage as to whether they had visited with their mother.
At the beginning of therapy, there were conflicts in the girls' relationship with each other which largely resolved by the end of their counseling sessions.
Crystal M., Daniella R. and Jessica D. live in the same foster home. They were placed there on July 12, 1996. The children had poor personal hygiene at the time of placement that has improved. Thy have thrived in their foster placement. Their foster mother testified that she and her husband love the children and she believes the girls love them. They are called Mommy and Poppy by the children. Sometimes Jessica calls her by her first name. The three girls will talk of their visits with their mother. These foster parents intend to adopt the three girls if they can.
Jose M., also called Joselito, was born December 19, 1993. He is presently 5 years old. At the time of the filing of the petition he was attending preschool. Dr. de Jesus describes Jose as exhibiting opposition and defiant behavior: he tends to behave in an erratic, angry and aggressive manner. "He tends to be very passive aggressive and also defiant towards persons who make demands on him." The doctor concludes that this behavior comes from feelings of loss and abandonment. He needs counseling an a home with structure, consistency, limits and nurturance.
Initially Jose was placed in foster care with his two older brothers. When they were removed, he spent a few months in one foster home and then was moved into the home he has been in since. Upon removal he was a listless child. His present foster parents report that while he is removed he does show responsiveness after a while. The foster parents of Daniela, Jessica and Crystal know Jose and see him almost weekly. Jose's foster mother is the mother-in-law of the three girls' foster parents' biological song. The girls' foster parents would like to adopt Jose as well if she is free for adoption.
The language of our statutes make it clear that in assessing a parent's rehabilitative prognosis, it must bed viewed in the context of what is "within a reasonable time, considering the age and needs of the child". § 17a-112 (b)(2). See also In re LuisC., 210 Conn. 157, 167, (1989); In re Davon M., 16 Conn. App. 693,548 A.2d 1350 (1988). It is the opinion of Dr. de Jesus that CT Page 3237 these children need permanency for stability, nurturance and emotional support. They all need a structured environment. Their mother's emotional health is so battered that she is overloaded trying to deal with the everyday demands of her life. Her problems are chronic and long term. She is overwhelmed and does not have insight into her own problems and how they have effected her ability to parent her children. His opinion was that psychologically, the four younger children were clearly identified with their foster parents. Nelson and Angel are more strongly bonded with their biological mother however the period of time (which will be well over a year and may be many years) that is necessary for her to gain sufficient insight through counseling to begin to understand her role and responsibilities for Nelson and Angel is longer than these children can wait. She has not yet even been willing to address the core issues in counseling.
The court finds that the petitioner has proven by clear and convincing evidence that Nelson T., Angel T., Jessica D., Daniela R., Jose M., and Crystal M. have been found neglected in a prior proceeding and the mother Migdalia M. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of each of these children, that Migdalia M., the mother could assume a responsible position in the life of any of these children.
Required findings
The court makes the following findings required by GeneralStatutes section 17a-112 (e). These findings supplement those already recited earlier in this opinion.
1. Timeliness, nature and extent of services offered or provided to facilitate the reunion of child with parent. See above. Services provided to mother were PETALOS for parenting and budgeting classes; Addiction Recovery Services, Northeast Clinical and New Perceptions; United services, Domestic Violence program for personal counseling, and substance abuse counseling. Jose M. was referred to anger management classes in Corrections. Juan R. was referred to Catholic Family Services for substance abuse evaluation. The mother has had regular visits offered to her with the children. Visits were offered to Mr. D., Mr. R., and Mr. M. Services offered were timely and appropriate. CT Page 3238
2. Terms of any applicable court order, and the extent to which the parties have fulfilled their obligation under the order. See above as to which expectation orders of the court were fulfilled and which were not by the mother and fathers. The father Juan R. had court ordered expectations. Neither fulfilled any of them. The other fathers were never present before the court. The mother as described earlier only partially fulfilled the court orders. She gained no perceptible benefit from her parenting classes. She refused to counsel on her own stormy past and so remains emotionally unable to approach her responsibilities to adequately parent any of these children.
3. Feelings and emotional ties of the child with respect to parent, and, any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed sufficient emotional tie. None of theses children have any emotional ties to any of their biological fathers. Nelson T. has an emotional bond with his mother. However, he ends up taking care of her in his mind. He has special needs which are a direct outgrowth of her failure to adequately parent him. He has an emotional bond with his foster mother. He has made great strides in her home. Angel T. has an emotional bond with his mother. Much of his difficult behavior is a result of his conflicted feelings about her. She has failed to adequately shelter and protect him; this has made his insecure and needy emotionally. He has an emotional bond with his foster mother. In her home he has progressed and has the benefit of a nurturing adult and structured home with her. Jessica D. is not very strongly connected to her mother. She does not express missing her mother between visits. She has made it clear that she does not wish to be returned to her home. She has a strong relationship with her foster mother. Daniela R. and her mother have no strong emotional tie. Neither pay much attention to each other on visits. She has an affectionate relationship with her foster mother and call her foster parents Mommy and Poppy. Jose M. and his mother are affectionate on visits. His sisters' foster mother, who sees him often, wishes to take care of him and care for him — he is comfortable in her home and enjoys being with his sisters. Crystal M. does not have a strong emotional attachment to her mother. She looks to her foster mother as her strong bond and attachment and as the person to meet her needs.
4. Age of the children.
Nelson T., born 11/26/87; 10 on 11/26/87; 11 years old CT Page 3239 on 11/26/88.
 Angel T., born 3/4/89; 8 on 3/4/97; 9 years old on 3/4/98.
 Jessica D., born 11/18/90; 7 on 11/18/97; 12 years old on 11/18/98.
 Daniela R., born 9/7/92; 5 on 9/7/97; 6 years old on 9/7/98.
 Jose M., born 12/19/93; 4 on 12/19/97; 5 years old on 12/19/98.
 Crystal m., born 2/2/95; 2 on 2/2/97; 3 years old on 2/2/98; 4 years old on 2/2/99. Given the ages and special needs of these children and their time in foster care they are in severe need of permanency in their home lives.
5. Parent's efforts to adjust to her circumstances to make it in the best interest of the child to return child to parent's home in the foreseeable future. See above.
-extent of parental contact with child and extent of parental contact or communication with child's guardian or custodian.: mother missed many of her visits with her children. Mr. M. made no attempt to visit his children or contact DCF on release from prison. Mr. R. stopped all contact after initial visits and his whereabouts are unknown. Mr. D. and Mr.T. have not contact and have not had contact with their children for many years.
6. Extent to which the parent has been prevented from maintaining a meaningful relationship with the child by unreasonable acts of child, other parent, or other person or by economic circumstances. None of the biological fathers nor the biological mother has been prevented from maintaining a meaningful relationship with their respective children by act of each other, the children, DCF or economic circumstances.
7. Whether DCF has made reasonable efforts to reunite the family pursuant to federal law. DCF has made reasonable efforts to reunite the mother with her children offering visitation and rehabilitative services as more fully described throughout this memorandum. DCF has made reasonable efforts to reunite each of he CT Page 3240 biological fathers; it is they who have failed to remain in contact or express an interest in or concern for their children.
Disposition
These children have been in foster care for over 2 1/2 years. This unsettled condition has absorbed a significant portion of each of their childhoods. The two older boys, Nelson and Angel are still significantly bonded with their mother. This is a serious consideration. However, each has been scarred by the grossly inadequate physical and emotional care that they have received from their mother. She has not made the strides necessary over these 2 and 1/2 years to be able to competently care for them. They would be returning to the same quagmire from which they had to be removed. Both Nelson and Angel have, because of their age and connection to their mother, taken longer to establish a bond with their foster mother. However, with the passage of time they have settled into a secure and nurturing home with their foster mother. They are emotionally attached to her as well. She offers them a safe and secure upbringing. She would like to adopt them. They cannot risk the insecurity of lack of permanency continuing to wait for their mother to undertake the painful task of personal emotional rehabilitation that she has avoided to date. The mother's plight in life is tragic.
There is very little emotional connection between Daniela and her mother. She is very well bonded with her foster parents and doing well there. In her 6 years, she has spent over one-third of her life in foster care. She deserves the security of a permanent, loving, stable home. Jessica is a parentified child. She spent much of her time living with her mother trying to take care of her younger siblings. She has suffered terribly from the lack of care from her mother. While she is friendly with her mother, it is clear she does not want to be moved from her foster home. She is loved there and has blossomed and developed a far more positive existence and been allowed to enjoy her childhood. At 8 years of age, it is time she be given the permanency she most desperately needs.
Crystal is in the same foster home with Daniela and Jessica. Crystal has spent most of her life in foster care. She is emotionally bonded to her foster mother very strongly. She left her mother's care at about 1 and 1/2 years of age and been in foster care for 2 and 1/2 years. She needs security and permanency. CT Page 3241
Jose has been in foster care for about half of his life. He is closely bonded to his sisters. Perhaps as indicia of their devotion to his sisters and knowing Jose, the girls' foster parents would like to adopt him as well. He has been in foster care with foster relatives and this has made it possible for the tie to the sisters to remain strong. Jose has been diagnosed with significant emotional needs for a very structured, stable and nurturing home. These are needs that his mother is incapable of meeting.
The biological fathers have all abandoned their children. Futile efforts were made to help Juan R. and Jose M. rehabilitate themselves as parents. All of the fathers have been absent and disinterested for a very long time. The court finds, based upon all the evidence presented, that DCF has proven by clear and convincing evidence that: it is in the best interest of Nelson T. and Angel T. to terminate the parental rights of Luis T. and Migdalia M. to these two children; and that it is in the best interest of Jessica D. to terminate the parental right so of Jose D. and Migdalia M. to this child; and that it is in the best interest of Daniela R. to terminate the parental rights of Juan R. and Migdalia M. to this child: and that it is in the best interests of Jose M. and Crystal M. to terminate the parental rights of Jose M. and Migdalia M. to these two children.
These findings are made after considering each child's sense of time, need for a secure and permanent environment, the relationship that each has with the respective foster parents, and the totality of all the circumstances. In re Juvenile Appeal(Anonymous), 177 Conn. 663, 667-68, 673 (1979). See also, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of theChild 99 (1979).
Based on the foregoing findings, the court orders that termination of the parental rights orders issue as follows.
The parental rights of Luis T. the father and Migdalia M. in and to Nelson T. and Angel T. are hereby terminated. The parental rights of Jose D. the father and Migdalia M. the mother in and to Jessica D. are hereby terminated. The parental rights of Antonio R. the father and Migdalia M. the mother in and to Daniela R. are hereby terminated. The parental rights of Jose M. the father and Migdalia M. the mother in and to Jose M. and Crystal M. are hereby terminated. It is further ordered that the Commissioner of CT Page 3242 the Department of Children and Families is appointed the statutory parent for the purpose of securing an adoptive family for each of these children. The Commissioner shall give Nelson T. and Angel T.' foster mother first preference for their adoption. The Commissioner shall give Jessica D., Daniela R. and Crystal M.'s foster parents first preference for their adoption, and for the adoption of Jose M. if deemed appropriate. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
MUNRO, J.